595 S.E.2d 461

**Randolph SINGLETON, Respondent,**

v.

**STOKES MOTORS, INC. d/b/a Stokes Toyota, Petitioner,**

**And also Valerie Singleton, Respondent,**

v.

**Stokes Motors, Inc. d/b/a Stokes Toyota, Petitioner.**

No. 25804.

Supreme Court of South Carolina.

Heard Jan. 8, 2004.

Decided April 12, 2004.

Rehearing Denied May 14, 2004.

H. Fred Kuhn, Jr., of Moss & Kuhn P.A., of Beaufort, for Petitioner.

Philip Fairbanks and Kathy D. Lindsay, both of Fairbanks & Lindsay P.A., of Beaufort, for Respondents.

Chief Justice TOAL:

This Court granted certiorari to review the Court of Appeals' unpublished opinion (1) affirming the trial judge's decision to award each plaintiff minimum statutory damages under Uniform Commercial Code ("UCC" or "Code") § 36–9–507(1)

(Supp. 2000); and (2) reversing the trial judge's finding that the UCC and the South Carolina Unfair Trade Practices Act ("SCUTPA") causes of action were factually inconsistent. We affirm.

### FACTUAL/PROCEDURAL BACKGROUND

On March 27, 1997, Randolph and Valerie Singleton (Singletons) decided to purchase a used 1993 Chevrolet Silverado pickup truck from Stokes Motors (Stokes) in Beaufort, South Carolina. To carry out the transaction, they signed a note and purchase money security agreement (sales contract). As part of the purchase price, the Singletons were to trade-in their Dodge Dakota and make a cash down payment of $1600. The sales contract did not indicate that the sale was contingent upon credit approval.

That same day, the Singletons signed a second document, a bailment agreement, which unlike the sales contract, provided that they were accepting the Silverado subject to credit approval. If their credit was not approved, the Singletons were required, under the terms of the bailment agreement, to return the Silverado to Stokes "immediately upon notice or verbal communication."

After signing both documents, the Singletons drove off the lot in the Silverado, having given Stokes the Dakota trade-in and only $800 of the $1600 required cash down payment.

Nearly three weeks later, on April 16, 1997, the Singletons returned to Stokes because Stokes claimed that the loan paperwork could not be completed due to Mr. Singleton's failure to produce proof of income. Mrs. Singleton explained that her husband had lost his job but that he would soon be able to produce proof of income from his new job. The Singletons also admitted that they could not afford to pay the remaining $800 of the down payment. The salesperson told the Singletons to "forget about it," and they signed an entirely new sales contract.

The new sales contract, like the initial sales contract, reflected that the Dodge Dakota had been traded in, but it showed $800 as the required cash down payment. And even though the Singletons had yet to produce Mr. Singleton's proof of income, Stokes told them that their credit had been

approved. Finally, Stokes never asked the Singletons to sign another bailment agreement during this second meeting. So after signing the new sales contract and paying nothing further in cash, the Singletons were permitted to drive away in the Silverado.

Ultimately, Stokes could not verify Mr. Singleton's employment. In addition, contrary to Stokes's statements at the second meeting, the Singletons' credit was never approved. Therefore, Stokes repossessed the Silverado from the Singleton home before the first payment on the truck was even due.

After the Silverado was repossessed, Mrs. Singleton went to Stokes to demand the return of the $800 down payment and the Dakota trade-in. Stokes refused to return either, claiming that it had already spent approximately $800 repairing the trade-in and had already paid off the Singletons' existing loan on the Dakota. For the return of the Dakota, Stokes told the Singletons that they would need to secure another loan. But because they could not secure a loan, the Singletons were left without a vehicle and without their $800.

Stokes subsequently resold the Silverado to another customer without notifying the Singletons. And eventually, Stokes sold the Dakota trade-in.[1]

The Singletons filed separate, identical complaints, alleging causes of action based on the UCC and the SCUTPA.[2] The UCC claim stemmed from Stokes's failure to notify the Singletons in writing that Stokes intended to sell the repossessed Silverado. Because the Singletons did not receive such notice, they claimed that they were entitled to collect the minimum statutory penalty provided under the UCC. The SCUPTA claim stemmed from Stokes's (1) failure to return the $800 cash down payment and the Dodge Dakota and (2) failure to inform the Singletons that the Silverado was being resold.

1. Stokes realized a substantial profit on both the re-sale of the Silverado and the sale of the Dakota trade-in. Stokes was able to re-sell the Silverado for $2,595 more than the amount due under the Singleton contract. And the Dakota trade-in was sold for a cash price of $14,000, giving Stokes a $7,326 profit (after Stokes made repairs and paid off the lien). Therefore, Stokes realized a profit of $9,921 by conducting the Singleton transaction in the manner that it did.

2. By the parties' consent, the cases were consolidated before trial.

The trial judge initially found for the Singletons on both claims. As to the UCC claim, the judge found that the Singletons were entitled to notice of Stokes's disposition of the Silverado. Because they did not receive such notice, the judge awarded Mr. and Mrs. Singleton $10,881 each as directed by the UCC minimum statutory penalty provision. As to the SCUTPA claim, the judge found that Stokes's refusal to return the Dakota and the $800 cash constituted a violation of the act. Therefore, the judge awarded the Singletons $8,029 in actual damages (the $800 cash deposit plus the net value of the Dodge Dakota), then trebled the award for a total of $24,087.

After the order was issued, Stokes filed a motion to reconsider, arguing that the UCC and the SCUTPA causes of action were factually inconsistent. In other words, Stokes argued that the facts required to prove one cause of action necessarily negated the facts necessary to prove the other cause of action. The trial judge agreed with Stokes and issued an order reducing the award in the initial judgment.

In this second order, the trial judge reasoned that for the SCUTPA cause of action to succeed, he must find that the sale of the Silverado to the Singletons was never finalized. If the sale were final, then the Dakota trade-in and the $800 cash down payment belonged to Stokes, and Stokes could dispose of either as it wished. It was impossible, the judge reasoned, for Stokes to violate SCUTPA for refusing to return its own property.

At the same time, for the UCC claim to survive, a sale must have occurred. And because the judge found that a sale had taken place, the Singletons' no longer had a valid SCUTPA claim. Therefore, the trial judge found that the UCC and the SCUTPA claims were factually inconsistent, and he reduced the damages to reflect the UCC award only.

The Court of Appeals affirmed the trial court's award to both Singletons for the UCC violation but reversed the trial court's finding that the UCC and SCUTPA causes of action were factually inconsistent. The court found that the UCC and SCUTPA claims were separate and distinct, permitting the Singletons to recover under both.

This Court granted certiorari to review the Court of Appeals' decision and the following issues:

I. Did the Court of Appeals err in affirming the trial judge's decision to award the minimum statutory penalty under the UCC to both Mr. and Mrs. Singleton?

II. Did the Court of Appeals err in reversing the trial judge's ruling that the UCC and SCUTPA claims were factually inconsistent?

## LAW/ANALYSIS

### I. UCC AWARD TO BOTH SINGLETONS

Stokes argues that the Court of Appeals erred in affirming the trial judge's decision to award UCC damages to both Mr. and Mrs. Singleton. We disagree.

The UCC outlines the rights, remedies, and duties of parties to secured transactions. In particular, Article 9, Part 5,[3] prescribes the procedures that a secured party must follow when a debtor defaults under a security agreement. S.C.Code Ann. § 36–9–501—36–9–607 (Supp.2000). Upon default, a secured party may re-sell the collateral. S.C.Code Ann. § 36–9–504(1) (Supp.2000). In most circumstances, a debtor is entitled to reasonable notification of the time and place of sale or other intended disposition of repossessed collateral is to be made. S.C.Code Ann. § 36–9–504(3) (Supp.2000).[4] If no such notice is given, the debtor has a statutory right to recover. S.C.Code Ann. § 36–9–507(1) (Supp.2000).

This right to recover and the formula used to calculate the amount of recovery are outlined in the Code as follows:

If the disposition has occurred **the debtor or any person entitled to notification or whose security interest has**

---

**3.** Unless otherwise stated, the Code sections refer to the *former* Article 9, the law applicable at the time the underlying lawsuit was filed. In July 2001, Article 9 was significantly revised, and we address the applicable revisions when appropriate.

**4.** Reasonable notification may not be required when the "collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market" or when the debtor has signed, after default, "a statement renouncing or modifying his right to notification of sale." S.C.Code Ann. § 36–9–504(3) (Supp.2000).

**been made known to the secured party** prior to the disposition **has a right to recover** from the secured party any loss caused by a failure to comply with the provisions of this part. **If the collateral is consumer goods,** the debtor has a right to recover in any event an amount not less than the credit service charge plus ten percent of the principal amount of the debt or the time price differential plus ten percent of the cash price.

S.C.Code Ann. § 36–9–507(1) (Supp.2000) (emphasis added).

Further, the Code defines "debtor" as "the person who owes payment or other performance of the obligation secured, whether or not he owns or has rights in the collateral. . . ." S.C.Code Ann. § 36–9–105(d) (Supp.2000).

In the present case, Stokes concedes that it violated the Code's notice requirement by failing to notify the Singletons that it was re-selling the Silverado. Stokes also concedes that the Singletons were entitled to recover the minimum statutory damages according to the formula set forth in section 36–9–507(1) above. But what Stokes argues is that *both* Singletons should not have been able to recover for violations concerning *one* secured transaction.

■ Consequently, the issue before this Court is whether the term "debtor" includes *each* debtor in a secured transaction, such that both Mr. and Mrs. Singleton were entitled, individually, to recover damages under the Code.

The statutory language of section 36–9–507(1) (Supp.2000), on its face, suggests that as debtors, both Singletons were entitled to recover. The statute plainly states that "the debtor or anyone" who is entitled to notice, or whose security interest the secured party knows of, "has a right to recover." Because both Mr. and Mrs. Singleton signed the sales contract and were designated as "purchaser-debtors," *both* were entitled to notice and therefore *both* were entitled to recover under the Code.

Additionally, this Court has held that co-obligators or guarantors to a loan constitute "debtors" for purposes of recovery. *Crane v. Citicorp Nat'l Serv., Inc.,* 313 S.C. 70, 437 S.E.2d 50 (1993). Therefore, the Court found that the Code's penalty provision applied "to co-obligators of consumer goods security

agreements." *Id.* at 74, 437 S.E.2d at 53. Further, the Court described the rationale behind the penalty provision as follows:

the statutory penalty is evidence of the legislature's recognition that the small amount of compensatory damages that may be proven in a consumer goods repossession and sale would be insufficient to ensure creditor compliance with the Code's provisions.

*Id.* at 74–75, 437 S.E.2d at 53 (citation omitted).

Also in *Crane,* the Court addressed the creditor's concern that because an unlimited number of co-obligators could be liable on a contract, the creditor's liability could be significant if there were multiple guarantors. *Id.* The Court's response to this concern was that "the number of guarantors is within the creditor's control." *Id.* This response implies that creditors cannot expect to receive the benefit of having multiple guarantors without also bearing the risk of having multiple claimants. Should there be a default, the creditor could recover from any single guarantor. Likewise, if the creditor violated the Code, any or all guarantors could sue the creditor. Therefore, *Crane* stands for the proposition that multiple guarantors to one secured transaction are entitled to recover.[5]

In the present case, both Mr. and Mrs. Singleton signed the sales contract, making each of them a "purchaser-debtor" and each jointly and severally liable for the debt. If the Singletons had secured a loan and subsequently defaulted, Stokes could have sought payment from *either* Mr. or Mrs. Singleton. In other words, Stokes benefited from having two people, instead of one, fully liable for the debt. When Stokes failed to notify the Singletons that the Silverado was to be sold, it became subject to claims from either Singleton or both. Both parties filed complaints because both parties were entitled to notice, and therefore, we hold that *both* parties were entitled to minimum statutory damages.

---

5. The South Carolina Reporter's Comment in revised Article 9 confirms that *Crane* had the following effect: "a secured party can be liable to multiple debtors and secondary obligors for minimum damages with respect to a single secured obligation." Comment to S.C.Code. Ann. § 36–9–625 (Supp.2001).

We recognize that the outcome in this case would be different if the underlying action were brought today. In July 2001, the South Carolina General Assembly enacted revised Article 9, which included substantial changes, including an entirely new section entitled, "Nonliability and limitation on liability of secured party; liability of secondary obligor." This new section contains a provision which states "[a] secured party is not liable under Section 36-9-625(c)(2) more than once with respect to any one secured obligation." S.C.Code Ann. § 36-9-628(e) (2003).

The South Carolina Reporter's Comment to section 36-9-628(e) explains that while all debtors and guarantors are entitled to bring claims for minimum damages, the secured party's aggregate liability is limited to a single recovery. Comment to S.C.Code. Ann. § 36-9-628 (Supp.2001). Accordingly, the Comment states, this new section effectively overrules the *Crane* holding with respect to recovery of statutory minimum damages. *Id.*

■■ But the law in effect at the time the cause of action accrued controls the parties' legal relationships and rights. *Stephens v. Draffin,* 327 S.C. 1, 5, 488 S.E.2d 307, 309 (1997). In addition, legislative intent is paramount in determining whether a statute has a prospective or retroactive application. *Jenkins v. Meares,* 302 S.C. 142, 146, 394 S.E.2d 317, 319 (1990) (citation omitted).

■ Revised Article 9 was not effective until July 1, 2001, nearly four years after the Singletons sued. Moreover, revised Article 9 clearly states that "[t]his act does not affect an action, case, or proceeding commenced before this act takes effect." S.C.Code. Ann. § 36-9-702 (Supp.2001). Because the underlying lawsuit arose before July 2001, revised Article 9 does not apply in the instant case.

Therefore, given the plain meaning of S.C.Code Ann. § 36-9-507(1) (Supp.2000) and this Court's ruling in *Crane,* we hold that Mr. and Mrs. Singleton were entitled, individually, to recover the minimum statutory penalty from Stokes.

## II. FACTUAL INCONSISTENCY/UCC AND SCUTPA CLAIMS

Stokes argues that the Court of Appeals erred in reversing the trial judge's ruling that the UCC and the SCUTPA causes of action were factually inconsistent. We disagree.

■■■ The South Carolina Unfair Trade Practices Act declares unfair or deceptive acts or practices in trade or commerce unlawful. S.C.Code Ann. 39–5–20(a) (2002). The Act provides that:

> [a]ny person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of an unfair or deceptive method, act or practice may bring an action to recover actual damages.

S.C.Code Ann. 39–5–140(a) (2002). Plaintiffs must allege and prove that the defendant's actions adversely affected the public interest. *Daisy Outdoor Adver. Co., Inc. v. Abbott*, 322 S.C. 489, 493, 473 S.E.2d 47, 49 (1996) (citations omitted). An impact on the public interest may be shown if the acts or practices have the potential for repetition. *Crary v. Djebelli*, 329 S.C. 385, 387, 496 S.E.2d 21, 23 (1998) (citation omitted). The potential for repetition may be shown in either of two ways: (1) by showing the same kind of actions occurred in the past, thus making it likely they will continue to occur absent deterrence; or (2) by showing the company's procedures created a potential for repetition of the unfair and deceptive acts. *Id.* at 388, 496 S.E.2d at 23. (citation omitted).

Initially, the trial judge found that Stokes violated SCUTPA by knowingly and willfully retaining the cash down payment and the Dakota trade-in. The judge also found that Stokes's actions were part of its standard business practices, and accordingly, were capable of repetition and impacted the public interest.

But in a subsequent order, the trial judge dismissed the SCUTPA claim, finding that the UCC and SCUTPA claims were factually inconsistent. The judge agreed with Stokes's argument that once Stokes sold the Silverado to the Singletons, Stokes became the rightful owner of the $800 cash down payment and the Dakota trade-in. Therefore, Stokes could not have violated the SCUTPA for retaining its own property.

The Court of Appeals reversed the lower court and found that the UCC and the SCUTPA claims were not factually inconsistent because the allegations concerning Stokes's unfair trade practices were separate and distinct from the UCC claim. As to the SCUTPA claim, the court pointed to fact that

(1) Stokes repossessed the Silverado before payments became due, and (2) Stokes profited from reselling the Silverado for an amount in excess of the Singletons' purchase price and from retaining the Singletons' down payment, including the trade-in vehicle. The UCC claim, however, was based on a statutory provision requiring notice.

We agree with the Court of Appeals' decision that the UCC and SCUPTA claims are not factually inconsistent. In addition to the facts highlighted by the Court of Appeals, we base our decision on additional wrongdoing by Stokes, namely (1) having customers sign both an unconditional sales contract and a conditional bailment agreement; and (2) misleading customers to believe that their credit has been approved. The facts necessary to demonstrate both of these practices do not negate the facts necessary to make the UCC claim, since such wrongdoing occurred *before* the Silverado sale was finalized. Moreover, we hold that these practices, by themselves, constitute SCUPTA violations.

First, Stokes's practice of having customers sign two contradictory documents—an unconditional sales contract and a conditional bailment agreement—is an essential part of conducting what is commonly referred to as a "yo-yo" sale. The "yo-yo" or "spot-delivery" sale typically proceeds in the following way:

> The consumer believes a vehicle's installment or sale is final and the dealer gives the consumer possession of the car "on the spot." The dealer later tells the consumer to return the car because the financing has fallen through. If the consumer does not return the vehicle or agree to rewrite the transaction on less favorable terms, the dealer repossesses the vehicle.

National Consumer Law Center, *Unfair and Deceptive Acts and Practices* 316 (5th ed. 2001).

Yo-yo sales are unlawful in at least seven states and several other states have issued regulations and administrative interpretations to car dealers on the subject. *Id.* at 317. Such transactions are fundamentally unfair because they give all of the power to the dealer, and none to the customer:

> On the one hand, once the customer drives the car off the lot, the consumer is locked into the sale. The dealer does not want the consumer to think about the deal overnight—it

wants the deal closed on the spot while the consumer has just undergone hours of sales pressure.

On the other hand, the dealer wants to retain its options when the consumer drives off the lot with the car. It does not want to be rushed into a hasty deal. It wants time for its personnel to review the profit margin, the consumer's credit rating, and the chances of selling the vehicle to someone else. It wants time to reflect on whether it can squeeze more out of the consumer or whether it is better off selling the vehicle to someone else.

Usually, the dealer will want to hide the one-sided nature of the transaction. It does not want consumers to think that they can get out of a deal just because the dealer can. So the dealer will not disclose that the deal, from the dealer's point of view, is not final.

*Id.* at 317.

The manner in which Stokes handled the Singleton transaction mirrored a yo-yo sale. During the first round of negotiations, the Singletons were led to believe that the sale was final and that the Silverado was theirs. At the same time, Stokes retained the option to enforce the bailment agreement—which it did—compelling the Singletons to return to the lot. During this second visit, Stokes told the Singletons that their credit had been approved, renegotiated the sales contract, and allowed the Singletons to drive away in the Silverado once again, believing it was theirs. Yet before the first payment became due, Stokes repossessed the truck. Apparently the financing had not been approved after all.

■ Stokes's deception concerning credit approval and the practice of having customers sign both an unconditional sales contract and a conditional bailment agreement are patently unfair and deceptive acts. Because Stokes admitted that it was a standard business practice to handle deals in this manner, we find that such acts were capable of repetition, having the requisite impact on the public interest. Therefore, we hold that (1) outright deception concerning credit approval and (2) the practice of having customers sign both an unconditional sales contract and a conditional bailment agreement constitute SCUTPA violations.

Stokes, and other car dealerships, could easily cure the unfairness of such practices by (1) including language in the

sales agreement that the sale is conditional upon the buyer obtaining financing and (2) telling customers the truth about their credit.

■ Finally, given that these instances of wrongdoing are not dependent on the facts required to establish the UCC violation, we hold that the SCUTPA and the UCC claims are not factually inconsistent, entitling the Singletons to bring claims under both statutes.

## CONCLUSION

In sum, we find that both debtors were entitled minimum statutory damages under S.C.Code Ann. § 36–9–507(1) (Supp. 2000). Additionally, we deem (1) the practice of having customers sign both an unconditional sales contract and a conditional bailment agreement and (2) outright deception regarding credit approval SCUTPA violations. Finally, because the facts necessary to establish the SCUTPA violation were not inconsistent with the facts required to establish the UCC violation, we hold that the Singletons could bring claims under both statutes.

**AFFIRMED.**

WALLER, BURNETT, PLEICONES, JJ., and Acting Justice JAMES R. BARBER, III., concur.