**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 24-1860

DESIGN GAPS, INC.; DAVID GLOVER, Individually and Officer of Design Gaps, Inc.; EVA GLOVER, Officer of Design Gaps, Inc.,

Plaintiffs - Appellants,

v.

DISTINCTIVE DESIGN & CONSTRUCTION LLC, d/b/a Distinctive Design LLC; BRYAN REISS, Individually and President of Distinctive Design; WENDY REISS, Individually and Vice President of Distinctive Design & Construction LLC; SHELTER, LLC, d/b/a Shelter Custom-Built Living; RYAN BUTLER; JENNY BUTLER, Individually and Design Coordinator Shelter Custom-Built Living, as the personal representative for the estate of Ryan Butler; KACIE M. HIGHSMITH, Individually and as Trustee of the Kacie M. Highsmith Trust,

Defendants - Appellees.

Appeal from the United States District Court for the District of South Carolina, at Charleston.  Richard Mark Gergel, District Judge.  (2:23-cv-00197-RMG)

Argued:  September 12, 2025                    Decided:  December 5, 2025

Before THACKER, QUATTLEBAUM, and HEYTENS, Circuit Judges.

Affirmed by published opinion. Judge Quattlebaum wrote the opinion, in which Judge Thacker and Judge Heytens joined.

**ARGUED:** Todd Maurice Hess, HESS LAW, PLLC, Waxhaw, North Carolina, for Appellants.  Andrea L. McDonald, WOMBLE BOND DICKINSON (US) LLP, Charleston, South Carolina, for Appellees.  **ON BRIEF:** James E. Weatherholtz, Robert Andrew Walden, WOMBLE BOND DICKINSON (US) LLP, Charleston, South Carolina, for Appellees.

———————

QUATTLEBAUM, Circuit Judge:

Federal trial courts are busy places. They have enough to do with new cases that are continuously adding to their dockets. They would be even more burdened if litigants could bring new cases asserting claims that were or could have been decided in prior proceedings. To help prevent that problem, preclusion principles—the doctrines of res judicata and collateral estoppel—step in. Though they operate a little differently, both promote the finality of state and federal court judgments and protect against repetitive litigation by preventing the relitigation of claims and issues already decided in prior proceedings. *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008).

Res judicata and collateral estoppel figure prominently in this appeal. That's because, after a squabble developed over a cabinet and closet job for a luxury home in Charleston, South Carolina, the parties went to arbitration. The arbitration turned out well for the homeowners and the general contractor overseeing the home renovations but badly for the cabinet maker. And the district court confirmed the arbitration award. Dissatisfied with the arbitration result, the cabinet maker and its owners brought this case in federal court. They sued some of the parties to the arbitration, as well as a new company and new individuals, some of whom the cabinet maker had unsuccessfully tried to bring into the arbitration.

The defendants in the new case moved to dismiss and for summary judgment, arguing primarily that res judicata and collateral estoppel precluded the new lawsuit. The district court agreed. It dismissed and granted summary judgment to the defendants on most

3

of the claims on those principles and granted summary judgment to the defendants on others because they were barred by the statute of limitations, waiver or laches.

The cabinet maker appealed, but we affirm the district court. As the district court found, most of the claims were brought either against the same parties to the arbitration or those in privity with them. And the claims and issues in this lawsuit either were actually decided in the arbitration or arose from the same facts and thus could have been brought in those proceedings. So, res judicata and collateral estoppel preclude many of Design Gaps' claims. As for the straggling claims involving issues distinct from those previously arbitrated, we find no error in the district court's conclusion that they are barred.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This appeal involves four sets of parties and four legal proceedings. Because the identities of the parties and their relationships to each other and to the different proceedings are important here, we describe them in some detail.

David and Eva Glover own and operate Design Gaps, Inc. Design Gaps designs and installs cabinetry in luxury homes in Charleston, South Carolina. *Design Gaps, Inc. v. Shelter, LLC,* 130 F.4th 143, 144 (4th Cir. 2025).[1] Design Gaps frequently worked with Shelter, LLC, a general contractor engaged in homebuilding and renovation in the Charleston area. *Id.* at 144. During the period relevant to this appeal, Ryan and Jenny Butler owned and operated Shelter.[2]

---

[1] For background information, we cite to our previous decision in related litigation involving some of the parties. We'll get to that case and our decision in a bit.

[2] Mr. Butler passed away during the district court proceedings.

4

Through their years of working together, Design Gaps and Shelter had disputes. For example, Design Gaps claimed from time to time that Shelter advertised Design Gaps' cabinets without attributing the work to Design Gaps. Another disagreement developed after Dr. Jason and Kacie Highsmith hired Shelter to renovate their home on Ralston Creek Street near Charleston. Shelter brought in Design Gaps to handle the cabinets and closets. The Highsmiths and Shelter signed contracts with Design Gaps with respect to the cabinet and closet work. Their contracts provided that any disputes arising from the contracts must be resolved through arbitration.

At least as far as the cabinets were concerned, the project did not go well. Eventually, the Highsmiths became so dissatisfied with what they perceived as Design Gaps' delays that they walked away from their contracts with Design Gaps and brought an arbitration proceeding against it. *Id.* at 145. Shelter joined the Highsmiths in bringing the arbitration.

But Design Gaps had not completed the Highsmiths' cabinets and closets. *Id.* at 144–45. So, the Highsmiths hired Distinctive Design & Construction LLC—which Bryan and Wendy Reiss own and operate—to finish the job. *See id.* at 144–45; J.A. 17. Before the Highsmiths retained Distinctive Design officially, however, Ms. Butler of Shelter and Ms. Highsmith shared the copyrighted drawings Design Gaps prepared with Mr. Reiss of Distinctive Design. *Design Gaps*, 130 F.4th at 145; J.A. 577–78. Around this time, the Highsmiths transferred their home into the Highsmith Trust. Ms. Highsmith became the trustee.

5

In the arbitration, Shelter and the Highsmiths asserted claims for breach of contract, promissory estoppel, fraud and piercing the corporate veil. *Design Gaps*, 130 F.4th at 144 n.2, 145. Design Gaps brought a litany of counterclaims including breach of contract, tortious interference, conversion, unfair and deceptive trade practices, unjust enrichment and Copyright Act violations. *Id.* at 145. Design Gaps tried to bring in Ms. Butler, Mr. Reiss and Distinctive Design as third-party respondents in the arbitration. But the arbitrator refused because they were not parties to the contracts that contained the arbitration provisions.

After discovery, the arbitrator conducted a three-day hearing. Shelter and the Highsmiths called ten witnesses, including the Highsmiths, the Butlers and Mr. Reiss. Design Gaps called only Mr. Glover. Before concluding the hearing, the parties all agreed that they had an adequate opportunity to present evidence.

The arbitrator ruled in favor of Shelter and the Highsmiths on their claims and on Design Gaps' counterclaims. Relevant here, the arbitrator concluded that:

> [Design Gaps] did not establish any tortious interference in its contract by any party. It further did not establish that there was a civil conspiracy between and among [Shelter, the Highsmiths], Distinctive Design or any other party. . . . [Design Gaps] did not establish that [Shelter's and the Highsmiths'] conduct was unfair or deceptive and therefore cannot sustain an unfair trade practices act claim. [Design Gaps] did not establish that the conduct it complains of was repetitive or in violation of the public interest. Finally, since the parties entered a written contract, there cannot be a separate "quasi" contract recovery.
>
> [Design Gaps] gave to the [the Highsmiths and Shelter] their drawings for the cabinets. Obviously, this was for [the Highsmiths and Shelter's] review, approval, and use during the construction process. [The Highsmiths and Shelter] were free to use the drawings to measure the compliance of Design Gaps with these drawings and its obligation to install the designed cabinets

6

in accordance with its contractual obligation. [Design Gaps] failed to enter into evidence a valid copyright registration; however, even if they had, [the Highsmiths and Shelter] certainly established fair use of the design work, especially considering that Shelter did not profit from the design. The sharing of a pdf of the design did not materially impair the marketability of the design. [Design Gaps] failed to prove that [the Highsmiths and Shelter] or anyone else converted its designs for this project. Bryan Reiss of Distinctive Design confirmed that he did not use Design Gaps' designs for the cabinets. I am convinced by [Mr.] Reiss's testimony and the exhibits provided that any similarity in the designs is due to limitations of the space and the client's desired layout. Therefore, there has been no violation of any copyright which [Design Gaps] may have had.

J.A. 358–59.

After losing in arbitration, Design Gaps petitioned the district court to vacate the arbitration award.[3] Design Gaps and the Glovers also promptly filed a second, separate federal lawsuit, which is the one before us on appeal.

In the second federal action, Design Gaps asserted 16 claims.[4] The claims concern the events surrounding the termination of the Ralston Creek contracts—which were the subject of the arbitration—and Shelter's unattributed uses of Design Gaps' work. Because exactly what those claims are and who they are alleged against bear in our analysis, we

---

[3] We take judicial notice of court filings not included in the joint appendix as matters of public record. *See Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) (indicating we can take judicial notice of public records).

[4] To be precise, sometimes, Design Gaps and the Glovers asserted claims against one or more of the defendants. Other times, only Design Gaps and Mr. Glover or Mr. Glover alone asserted claims. These distinctions don't matter, so for ease of reference, we will refer to all the claims as Design Gaps' claims. There are three groups of defendants—Shelter and the Butlers; Distinctive Design and the Reisses; and Ms. Highsmith, individually and in her capacity as trustee. When referring to the claims against the Shelter defendants and the Distinctive Design defendants, we refer to these claims as the claims against Shelter and Distinctive Design, respectively, unless otherwise noted.

7

need to describe both in more detail. To do so, we first describe the claims asserted against each defendant, or groups of related defendants. We then describe the claims asserted against a mix of unrelated defendants or all defendants.

Against Distinctive Design and its owners, Mr. Reiss and Ms. Reiss, Design Gaps asserted claims for copyright infringement, Lanham Act unfair competition and tortious interference with a contract. These claims all involved Distinctive Design's receipt and alleged use of Design Gaps' copyrighted cabinet drawings for the Highsmiths' Ralston Creek home.

Against Shelter and its owners, Mr. Butler and Ms. Butler, Design Gaps asserted claims for vicarious copyright infringement, breach of contract, and Lanham Act false advertising, false designation of origin and unfair competition. In addition, Design Gaps asserted a separate breach-of-contract claim against the Butlers individually. The copyright infringement claim again concerned Distinctive Design's alleged receipt and use of Design Gaps' copyrighted cabinet drawings for the Ralston Creek home. The breach-of-contract claims and the Lanham Act claims pertained to Shelter's alleged use of images of Design Gaps' cabinets in Shelter's marketing materials without attributing the cabinets to Design Gaps, including images of the Ralston Creek project.

Against Ms. Highsmith, individually and as trustee of the Highsmith Trust, Design Gaps asserted claims for defamation per se and per quod.[5] The defamation claims are based

---

[5] "A statement is classified as defamatory *per se* when the meaning or message is obvious on its face," while a "statement is classified as defamatory *per quod* when the defamatory meaning is not clear unless the hearer knows facts or circumstances not

8

on Ms. Highsmith's alleged complaints to Downsview Kitchens—Design Gaps' primary cabinet supplier—that Mr. Glover of Design Gaps had "taken" the Highsmiths' money and "not provided the product and service he promised" in connection with the Ralston Creek project. J.A. 25 (internal quotation marks omitted); J.A. 67–69.

Against Shelter, the Butlers and Ms. Highsmith, in her capacity as trustee, Design Gaps asserted a claim for contributory copyright infringement. Against the Butlers and Ms. Highsmith in her capacity as trustee, Design Gaps asserted a claim for tortious interference. Against Distinctive Design, Mr. Reiss and Ms. Butler. Design Gaps claimed a violation of the South Carolina Trade Secrets Act for misappropriation of trade secrets. Finally, against all defendants, Design Gaps asserted claims for unjust enrichment and violations of the South Carolina Unfair Trade Practices Act (SCUTPA). All these claims involve the transfer of Design Gaps' copyrighted drawings for the Ralston Creek job to Distinctive Design and Distinctive Design's alleged use of them.

In the meantime, in Design Gaps' first federal proceeding seeking to vacate the arbitration award, the district court instead confirmed the award to Shelter and the Highsmiths. Design Gaps appealed.

While that appeal was pending, the defendants in the second, federal lawsuit moved to dismiss. Distinctive Design, Mr. Reiss and Ms. Reiss argued that collateral estoppel

---

contained in the statement itself, and the plaintiff must introduce extrinsic facts to prove the defamatory meaning." *Erickson v. Jones St. Publishers, LLC*, 629 S.E.2d 653, 664 (S.C. 2006) (citation omitted). We cite to South Carolina law when discussing principles of state law because South Carolina law governs the resolution of the state-law issues in this diversity action. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). The parties agree that South Carolina law applies here.

precluded Design Gaps from asserting claims against them because the arbitrator had already decided issues relevant to the claims in the new lawsuit. Alternatively, they contended that Design Gaps failed to allege facts sufficient to support its claims. Similarly, Shelter, the Butlers and Ms. Highsmith, individually and as trustee, also moved to dismiss, arguing that res judicata precluded Design Gaps' claims against them. In addition, Shelter and the Butlers asserted that Design Gaps had failed to state claims for relief because, for example, laches barred Design Gaps' Lanham Act claims, and Design Gaps had not timely filed its breach-of-contract claims within the relevant limitations period.

Agreeing with them in part, the district court found that res judicata barred Design Gaps' claims against Shelter, Mr. Butler, Ms. Butler and Ms. Highsmith, individually and as trustee, for copyright infringement, tortious interference, defamation, violation of the SCUTPA and unjust enrichment. It also found that collateral estoppel barred Design Gaps' claims against Distinctive Design, Mr. Reiss and Ms. Reiss. And the district court dismissed Design Gaps' misappropriation of trade secrets claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure insofar as the claim concerned post-arbitration conduct. Only Design Gaps' Lanham Act and breach-of-contract claims against Shelter and the Butlers—which involved Shelter's alleged unattributed uses of Design Gaps' work—survived.

The district court later granted the Butlers' and Shelter's motion for summary judgment on those remaining claims. The district court concluded that res judicata precluded Design Gaps' claims to the extent they involved the Ralston Creek project. And the district court found that the doctrine of laches barred Design Gaps' Lanham Act claims.

10

Finally, the district court also found that the statute of limitations and the doctrine of waiver extinguished Design Gaps' breach-of-contract claims.

Design Gaps appealed the district court's orders dismissing certain claims and granting summary judgment on others.

While the appeal of the second suit was pending, we dismissed Design Gaps' first appeal—which challenged the district court's confirmation of the arbitration award—for lack of subject matter jurisdiction. *Design Gaps*, 130 F.4th at 146–48. The district court then vacated its order confirming the arbitration award and dismissed the vacatur proceeding for lack of subject matter jurisdiction. Later, the parties took the confirmation/vacatur question to state court. Then, on the day we heard oral argument on the appeal of the second proceeding, a state court confirmed the arbitration award.

With that lengthy procedural history in mind, we turn at last to the appeal at hand.

## II. APPELLATE JURISDICTION

But before we get to the merits of Design Gaps' arguments, we must first determine whether we possess appellate jurisdiction. *Est. of Cunningham v. Mayor of Balt.*, 128 F.4th 238, 242 (4th Cir. 2025) (citation omitted). We have jurisdiction over "appeals from all final decisions of the district courts of the United States." 28 U.S.C. § 1291. "Ordinarily, a district court order is not 'final' until it has resolved all claims as to all parties." *Fox v. Balt. City Police Dep't*, 201 F.3d 526, 530 (4th Cir. 2000).

Even so, "some cases in which district courts fail to address all claims or parties still present reviewable final orders." *Cunningham*, 128 F.4th at 242. In making this determination, we look to the substance of the underlying decision, not its form. *Id.*

11

(citation omitted). "Among key factors that make an order final—and, thus, within our jurisdiction for appellate review—are whether the district 'order display[ed] an awareness of the [missing] claim,' used 'language encompassing' that claim, or 'addressed the central component' of the claim." *Id.* (alterations in original) (quoting *Hixson v. Moran*, 1 F.4th 297, 301 (4th Cir. 2021)).

### A. The District Court Issued a Final Decision on Design Gaps' Second Breach-of-Contract Claim Against Ms. Butler

Design Gaps contends that the district court did not issue a final decision because it did not resolve Design Gaps' second breach-of-contract claim against Ms. Butler. According to Design Gaps, this claim addressed a personal-use discount that Design Gaps and Ms. Butler negotiated for one of the Shelter-Design Gaps projects unrelated to Ralston Creek. Design Gaps alleges that Mr. Glover agreed to a 25% discount on the contract price after Ms. Butler represented that the construction concerned modifications to her personal residence. Design Gaps later learned that the Butlers sold the property prior to occupying it. As a result, Design Gaps alleges, it is "entitled to reimbursement of the personal use discount for the" project. J.A. 34–35.

Contrary to Design Gaps' characterization of this claim, its breach-of-contract claims do not mention or seek reimbursement of the personal-use discount. Instead, the identically formatted claims concern violations of promotional use clauses found in the contracts governing the Shelter-Design Gaps construction projects, including the Ralston Creek job. These clauses required Shelter to credit Design Gaps when advertising work that included Design Gaps' cabinets.

12

Quite naturally, since that was what Design Gaps alleged, the district court's analysis focused on Design Gaps' allegations concerning Shelter's breaches of promotional use clauses; it did not reference the personal-use discount. Thus, the district court grappled substantively with what Design Gaps actually asserted—breaches of the promotional use clauses. And our jurisdictional analysis is not impacted by the district court's failure to address allegations Design Gaps did not assert.

**B.  The District Court Issued a Final Decision on Design Gaps' Misappropriation of Trade Secrets Claim Against Ms. Butler**

We also asked the parties for supplemental briefing on whether the district court resolved Design Gaps' claim for misappropriation of trade secrets to the extent it alleged a claim against Ms. Butler. The district court's handling of this claim is a bit confusing. In the introductory portion of its order on the defendants' motions to dismiss, the district court stated that "[a]ll claims against Defendants Distinctive Design, Bryan Reiss, Wendy Reiss, and Kacie M. Highsmith, individually and as trustee of the Kacie M. Highsmith Trust, are dismissed. Only Plaintiffs' Lanham Act and breach of contract claims against Defendants Shelter, Ryan Butler, and Jenny Butler remain." J.A. 561. This statement doesn't explicitly say anything about the dismissal of Design Gaps' misappropriation of trade secrets claim against Ms. Butler. But the statement does not list that claim among the remaining claims, either.

Then, the district court divided its analysis between a motion brought by Ms. Butler and a motion brought by Distinctive Design. Perhaps by mistake, the district court organized its analysis of the misappropriation of trade secrets claim under the heading

13

pertaining to Distinctive Design's motion even though Ms. Butler also moved to dismiss this claim. Even so, the district court's discussion shows its awareness of the misappropriation of trade secrets claim against Ms. Butler. In reciting Design Gaps' allegations, the district court twice referred to Ms. Butler, by name, as a participant in the alleged misappropriation.

Also, the district court addressed the substance of the misappropriation of trade secrets claim against Ms. Butler. The district court correctly stated that a claim for misappropriation of trade secrets under the South Carolina Trade Secrets Act requires "misappropriation, wrongful disclosure, or wrongful use" of a trade secret. S.C. CODE ANN. § 39-8-30(C); J.A. 577. The district court emphasized the arbitrator's conclusion that Design Gaps "failed to prove that [Shelter, the Highsmiths] or anyone else converted its designs," which the district court equated with a determination that no party in the present litigation misappropriated, wrongfully used or wrongfully disclosed Design Gaps' trade secrets. J.A. 578 (quotation omitted).

In the end, we are satisfied that the district court addressed the substance of Design Gaps' misappropriation of trade secrets claim against Ms. Butler and entered a final order. Considering all of this against the standard from *Cunningham*, we have jurisdiction.

### III. DISCUSSION

Turning now to the merits of Design Gaps' arguments, Design Gaps primarily challenges the district court's res judicata and collateral estoppel rulings. We address those issues first before considering whether the district court properly granted summary

14

judgment on Design Gaps' breach-of-contract and Lanham Act claims based on the statute of limitations, waiver and laches.

## A. The Judgment Confirming the Arbitration Award Precluded Design Gaps from Relitigating Certain Claims

We begin by considering whether the district court properly applied res judicata and collateral estoppel.[6] This is not your normal res judicata/collateral estoppel case. Most of the adjudication was done by an arbitrator, whose decision was then confirmed though a court judgment.

Design Gaps does not argue that res judicata and collateral estoppel do not apply to a judgment confirming an arbitration award, as a general matter. But we think this point deserves more explanation before we dive into our analysis. That's because, as already discussed, the district court confirmed, but later vacated, its confirmation of the arbitration award. Then, a South Carolina state court confirmed it, resulting in a new judgment.

---

[6] The district court determined that res judicata and collateral estoppel applied to some of Design Gaps' claims at the motion to dismiss stage and that res judicata applied to others at the summary judgment stage. We review de novo a district court's decision granting a motion to dismiss, accepting well-pleaded facts as true and drawing all reasonable inferences in favor of Design Gaps. *Blair v. Appomattox Cnty. Sch. Bd.*, 147 F.4th 484, 491 (4th Cir. 2025). We review de novo a district court's grant of summary judgment. *Watts v. Md. CVS Pharmacy, LLC*, 142 F.4th 233, 237 (4th Cir. 2025). "Summary judgment is appropriate if 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* at 237–38 (quoting FED. R. CIV. P. 56(a)). "In applying that standard, we view the record evidence in the light most favorable to" Design Gaps, the non-moving party. *Id.* at 238. In addition, we review de novo a district court's application of the principles of res judicata and collateral estoppel. *T.H.E. Ins. Co. v. Davis*, 54 F.4th 805, 818 (4th Cir. 2022); *Hately v. Watts*, 917 F.3d 770, 777 (4th Cir. 2019).

We, as a federal court, must attribute preclusive effect to state-court judgments when courts in the state in which the judgment was entered would do so. *Washington v. Pellegrini*, 125 F.4th 118, 127 (4th Cir. 2025). Our analysis doesn't change when faced with a state-court judgment confirming an arbitration award. Indeed, when an arbitration award "is enforced by a state-court judgment," 28 U.S.C. § 1738 "requires that the judgment be accorded the preclusion effects recognized by the judgment state." 18B CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 4475.1 (3d ed. 2025).

Thus, because a South Carolina court confirmed the arbitration award, we look to South Carolina res judicata and collateral estoppel law to see whether it would give preclusive effect to the judgment confirming the arbitration award. And it does. *See Palmetto Homes, Inc. v. Bradley*, 593 S.E.2d 480, 482, 484–86 (S.C. Ct. App. 2004) (attributing preclusive effect to confirmed arbitration award).

In this situation, most of the adjudication was done by the arbitrator, not the court. Even so, the district court confirmed the award, resulting in a judgment. That leaves another question—to determine the preclusive effect of the arbitration award, do we look to the arbitrator's award or the state-court judgment confirming that award? We look to the former. Under South Carolina law, "[u]pon the granting of an order confirming" an arbitration award, a "judgment or decree shall be entered in conformity therewith and be enforced as any other judgment or decree." S.C. CODE ANN. § 15-48-150. In other words, we may now enforce the arbitrator's award, as reflected in the state court's judgment. *Accord U.S. ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244,

16

248 (9th Cir. 1992) (citing CAL. CIV. PROC. CODE § 1287.4) ("The state court judgment confirmed the [arbitration] award in all respects. Thus, the findings and conclusions of the arbitrator have the same force and effect as a decision reached by the court itself at the close of a fully litigated civil action.").

To be sure, this is not the exact analysis conducted by the district court since it considered the preclusive effect of a federal judgment when it granted the defendants' motion to dismiss in part. From a pure legal standpoint—with the benefit of hindsight—the district court's reliance on a now-vacated order was incorrect. Despite that, any errors in the district court's analysis are subject to harmless error review. FED. R. CIV. P. 61. And we are "satisfied 'with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the errors.'" *Shears v. Ethicon, Inc.*, 109 F.4th 235, 241 (4th Cir. 2024) (quoting *Wickersham v. Ford Motor Co.*, 997 F.3d 526, 531 (4th Cir. 2021)).[7] With these points out of the way, we move to Design Gaps' arguments.

### 1. Res Judicata

Res judicata, sometimes called claim preclusion, "bars subsequent actions by the same parties when the claims arise out of the same transaction or occurrence that was the

---

[7] In part, that's based on the fact that there's not much difference between South Carolina and federal res judicata and collateral estoppel law. *Compare Davis*, 54 F.4th at 820 n.7 (noting elements of res judicata under federal law), *and Westmoreland Coal Co. v. Sharpe ex rel. Sharpe*, 692 F.3d 317, 331 (4th Cir. 2012) (outlining elements of collateral estoppel under federal law), *with Hughes ex rel. Est. of Hughes v. Bank of Am. Nat'l Ass'n*, 898 S.E.2d 102, 130–31, 134 (S.C. 2024) (stating elements of res judicata and collateral estoppel under South Carolina law).

subject of a prior action between those parties." *Plum Creek Dev. Co. v. City of Conway,* 512 S.E.2d 106, 109 (S.C. 1999). Under South Carolina law, res judicata "may apply if (1) the identities of the parties are the same as in the prior litigation, (2) the subject matter is the same as in the prior litigation, and (3) there was a prior adjudication of the action by a court of competent jurisdiction." *Hughes ex rel. Est. of Hughes v. Bank of Am. Nat'l Ass'n*, 898 S.E.2d 102, 130–31 (S.C. 2024) (citation omitted).

### a. Ms. Butler was in Privity with Shelter

Design Gaps challenges the application of res judicata to the claims against Ms. Butler because she was not a party to the arbitration. Even more, Design Gaps argues it tried to join her as a party, but the arbitrator rejected that request. Because of this, Design Gaps argues the identity of parties required for res judicata to operate is missing.

But that argument overlooks the principle of privity. The "same" party element of res judicata, *id.*, means both "the same parties and their privies," *Plum Creek*, 512 S.E.2d at 108; *see also Yelsen Land Co., Inc. v. State*, 723 S.E.2d 592, 596 (S.C. 2012) (concluding that res judicata determination may rest on privity). "Privity as used in the context of res judicata . . . does not embrace relationships between persons or entities, but rather it deals with a person's relationship to the subject matter of the litigation." *Richburg v. Baughman*, 351 S.E.2d 164, 166 (S.C. 1986). Put differently, "[t]he term 'privy,' when applied to a judgment or decree, means one so identified in interest with another that he represents the same legal right." *Id.* at 166.

The question, then, is whether Ms. Butler was in privity with any of the actual parties to the arbitration. The district court held that Ms. Butler was in privity with Shelter. And

18

other than arguing Shelter and Ms. Butler are not the same party and arguing the arbitrator denied its request to bring Ms. Butler into the arbitration, Design Gaps offers no reason why she was not.

We see none either. Shelter is a small general contracting business. It acted through Mr. Butler and Ms. Butler, its principals. They performed all the actions that Design Gaps complained about in the arbitration and in this lawsuit. In arbitration, Design Gaps asserted, among others claims, counterclaims for tortious interference with a contract, conversion, unfair and deceptive trade practices, unjust enrichment and violations of the Copyright Act against Shelter. These counterclaims concerned Ms. Butler's alleged conduct as to the Ralston Creek contracts. And Design Gaps' judicial claims against Ms. Butler in this suit concern the same allegations.

We view the subject matter of these claims as the parties' alleged conduct in relation to the Ralston Creek contracts. And from this, we find that Ms. Butler and Shelter "are in privity to the extent the issue is" Ms. Butler's alleged conduct in relation to these contracts. *See Yelsen*, 723 S.E.2d at 596.

The fact that Design Gaps tried to bring Ms. Butler into arbitration but was unsuccessful does not change this result. True, it may seem a bit unintuitive to apply the privity principle of res judicata to a plaintiff who unsuccessfully tried to bring the privies into the prior proceeding. But despite the somewhat unusual way res judicata is being applied here, the principle of privity properly applies because Shelter and Ms. Butler share the same relationship to the subject matter of this litigation. And that's what matters when analyzing privity in the context of res judicata.

19

Resisting this conclusion, Design Gaps cites *LaRosa v. Pecora*, No. 1:07CV78, 2009 WL 1457739 (N.D. W.Va. May 21, 2009), for the proposition that, when an arbitrator refuses to join a party in arbitration, a party cannot argue that the non-joined party stood in privity with a party in the arbitration. There, applying West Virginia law, the district court determined that the relevant party "was not a party to the arbitration proceeding" and "was [not] in privity with" another party "in the arbitration proceeding." *LaRosa*, 2009 WL 1457739, at *3. Here, the situation is different. Unlike in *LaRosa*, Ms. Butler was in privity with Shelter. So, nothing about *LaRosa* or its reasoning changes our conclusion.

### b.  Ms. Highsmith in her Capacity as Trustee for the Highsmith Trust was in Privity with Ms. Highsmith in her Individual Capacity

Design Gaps also challenges the application of res judicata to the claims against Ms. Highsmith as trustee for the Highsmith Trust. Recall that Ms. Highsmith was a party to the arbitration individually. But sometime between when the Highsmiths signed the Ralston Creek contracts and the arbitration, the Highsmiths transferred the Ralston Creek home to the Highsmith Trust, of which Ms. Highsmith is the trustee. In this lawsuit, Design Gaps not only sued Ms. Highsmith individually but also asserted claims against her as trustee. And it claims that res judicata does not apply to the claims against her as trustee since she did not participate in the arbitration in that capacity.

Once again, this argument ignores the principle of privity in applying res judicata. Design Gaps' judicial allegations against Ms. Highsmith in this suit, individually and in

20

her capacity as trustee, relate to her conduct surrounding the Ralston Creek contracts. The allegations do not distinguish between the actions Ms. Highsmith took in her individual capacity and the actions she took as trustee. That the arbitration did not include the Highsmith Trust does not change Ms. Highsmiths' "relationship to the subject matter of the litigation," and res judicata may attach. *See Richburg*, 351 S.E.2d at 166.

### c.  Design Gaps' Defamation Claims Arise Out of the Same Subject Matter as the Arbitration

Design Gaps also argues res judicata does not apply to its defamation claims against Ms. Highsmith, either individually or as trustee, because those claims were not considered by the arbitrator. And it is true that Design Gaps did not allege defamation counterclaims among the claims that the arbitrator decided. But res judicata bars litigants "from raising any issues which were adjudicated in the former [proceeding] and any issues which might have been raised in the former [proceeding]." *Hilton Head Ctr. of S.C., Inc. v. Pub. Serv. Comm'n*, 362 S.E.2d 176, 177 (S.C. 1987).

Here, Ms. Highsmith's alleged defamatory statement is her complaint to Design Gaps' cabinet supplier, Downsview Kitchens, that Mr. Glover of Design Gaps had taken the Highsmiths' money and had not provided the service he promised. This statement involved Design Gaps' performance under the Ralston Creek contracts, which was the subject matter of the arbitration. Thus, Design Gaps may not have litigated the defamation claims in the arbitration, but it could have. Indeed, Design Gaps initially raised a defamation and libel counterclaim in arbitration but did not include it in its later amended pleading. Under these circumstances, res judicata applies.

21

#### d. Design Gaps' Lanham Act Claims About the Use of its Drawings at the Ralston Creek Home Arise from the Same Facts as the Arbitration

Design Gaps also argues that its Lanham Act claims were not litigated in the arbitration. However, to the extent those claims involved the transfer and use of Design Gaps' copyrighted drawings, or the parties' obligations under the Ralston Creek contracts, Design Gaps brought claims involving that same conduct in the arbitration. For the same reasons that res judicata bars the defamation claims against Ms. Highsmith, Design Gaps' Lanham Act claims involving the Ralston Creek projects are likewise barred.

To the extent those Lanham Act claims involve Shelter and Ms. Butler's use of Design Gaps' drawings in Shelter's marketing materials that did not concern the Ralston Creek project, the district court did not rule against Design Gaps based on res judicata—it granted summary judgment on those claims because they were barred by laches, which we address later.

### 2. Collateral Estoppel

Design Gaps next challenges the determination that collateral estoppel—sometimes called issue preclusion—barred its claims against Distinctive Design. The "doctrine of collateral estoppel precludes a party from relitigating an issue decided in prior litigation, regardless of whether the claims in the prior and instant litigation are the same." *Hughes*, 898 S.E.2d at 134. "For collateral estoppel to apply, it must be shown that the issue 'was: (1) actually litigated in the prior action; (2) directly determined in the prior action; [and] (3) necessary to support the prior judgment.'" *Id.* (quoting *Carolina Renewal, Inc. v. S.C. Dep't of Transp.*, 684 S.E.2d 779, 782 (S.C. Ct. App. 2009)). "While the traditional use of

collateral estoppel required mutuality of parties to bar relitigation, modern courts recognize the mutuality requirement is not necessary for the application of collateral estoppel where the party against whom estoppel is asserted had a full and fair opportunity to previously litigate the issue." *State v. Hewins*, 760 S.E.2d 814, 821 (S.C. 2014) (quoting *Carolina Renewal*, 684 S.E.2d at 782). "The doctrine of collateral estoppel should not be rigidly or mechanically applied." *Id.* (quoting *Carolina Renewal*, 684 S.E.2d at 782). "Thus, even if all the elements for collateral estoppel are met, when unfairness or injustice results or public policy requires it, courts may refuse to apply it." *Id.* (quoting *Carolina Renewal*, 684 S.E.2d at 782).

Design Gaps claims Distinctive Design did not satisfy the elements of collateral estoppel. It argues that Distinctive Design was not a party to the arbitration, despite the fact that Design Gaps tried to make it one. Having been denied that request, Design Gaps insists it did not have a full and fair opportunity to litigate against Distinctive Design and that the arbitration did not decide such claims.

First, the fact that Distinctive Design and Mr. Reiss were not parties in arbitration does not defeat collateral estoppel. Unlike res judicata, collateral estoppel does not require mutuality of parties. *See Carolina Renewal*, 684 S.E.2d at 782.

As to Design Gaps' contention that it did not have a full and fair opportunity to litigate its claims against Distinctive Design in arbitration, considerations relevant to this analysis include whether a party had "difficulties in procuring witnesses" and faced "procedural limitations affecting his opportunity to litigate." *See Zurcher v. Bilton*, 666 S.E.2d 224, 227 (S.C. 2008). Design Gaps makes a fair point that its inability to bring

23

Distinctive Design and Mr. Reiss into the arbitration compromised its ability to litigate its claims against them. Had they been parties, Design Gaps may have had greater flexibility and options. But the arbitrator did not limit Design Gaps' ability to take discovery from Distinctive Design about how it received and used Design Gaps' drawings. In fact, Design Gaps had the opportunity to depose and cross-examine Mr. Reiss and question Ms. Butler about her interactions with Mr. Reiss. This was sufficient for Design Gaps to explore the conduct of all the parties as to any use of Design Gaps' drawings of the Ralston Creek renovations. Thus, even though Distinctive Design and Mr. Reiss were not parties, Design Gaps had sufficient opportunity to litigate the issues underlying its claims against Distinctive Design.

This leaves us with Design Gaps' final argument—that the arbitrator did not decide the issues raised in its claims against Distinctive Design in this lawsuit. And it is true that since Distinctive Design was not a party, the arbitrator did not technically make a finding on those issues. But that is not determinative if the arbitration decision directly and necessarily resolved the issues in this lawsuit against Design Gaps. *See Hughes*, 898 S.E.2d at 134.

To see if that occurred, we first look at Design Gaps' copyright infringement counterclaim against Shelter. In asserting that claim, Design Gaps partially predicated Shelter's alleged violation on Mr. Reiss's "use" of Design Gaps' copyrighted drawings. J.A. 420. On this issue, the arbitrator concluded that Design Gaps:

> [F]ailed to prove that [Shelter, the Highsmiths] or anyone else converted its designs for this project. Bryan Reiss of Distinctive Design confirmed that he did not use Design Gaps' designs for the cabinets. I am convinced by [Mr.]

24

> Reiss's testimony and the exhibits provided that any similarity in the designs is due to the limitations of the space and the client's desired layout. Therefore, there has been no violation of any copyright which [Design Gaps] may have had.

J.A. 359. As the arbitrator's decision indicates, to resolve Design Gaps' copyright infringement counterclaim against Shelter, the arbitrator had to determine whether Mr. Reiss used the Design Gaps drawings when Distinctive Designs stepped in to finish the cabinet job after the Highsmiths terminated their contracts with Design Gaps. The arbitrator found that he did not. That finding was not just fatal to Design Gaps' claims against Shelter; it was fatal to its claim in this lawsuit that Distinctive Design infringed on Design Gaps' copyright. That's because, if Distinctive Design did not use Design Gaps' drawings in its work completing the cabinet job for the Ralston Creek home, it would not face copyright liability. *See Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991) (indicating that plaintiff must establish defendant copied work to prove copyright infringement). Therefore, the district court properly dismissed Design Gaps' copyright infringement claim against Distinctive Design based on collateral estoppel.

What's more, the arbitrator's finding that Distinctive Design did not use Design Gaps' drawings in its work at the Ralston Creek home is also fatal to Design Gaps' other claims against Distinctive Design. Design Gaps' claim for unfair competition under the Lanham Act required a showing "that the defendant's use of a 'reproduction, counterfeit, copy, or colorable imitation' of [a] mark creates a likelihood of confusion." *Westmont Living, Inc. v. Ret. Unlimited, Inc.*, 132 F.4th 288, 295 (4th Cir. 2025) (quoting *Variety*

25

*Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 661 (4th Cir. 2018)).[8] In concluding that Distinctive Design did not infringe on Design Gaps' copyright, the arbitrator directly and necessarily decided this issue.

Design Gaps' misappropriation of trade secrets and SCUTPA claims required similar showings. "Under the Trade Secrets Act, a person 'aggrieved by a misappropriation, wrongful disclosure, or wrongful use of his trade secrets may bring a civil action to recover damages incurred as a result of the wrongful acts.'" *Laffitte v. Bridgestone Corp.*, 674 S.E.2d 154, 161 (S.C. 2009) (quoting S.C. CODE ANN. § 39-8-30(C)). To succeed on its SCUTPA claim, Design Gaps had to prove that "(1) [Distinctive Design] engaged in an unfair or deceptive act in the conduct of trade or commerce; (2) the unfair or deceptive act affected [the] public interest; and (3) the plaintiff suffered monetary or property loss as a result of [Distinctive Design]'s unfair or deceptive act(s)." *Health Promotion Specialists, LLC v. S.C. Bd. of Dentistry*, 743 S.E.2d 808, 816 (S.C. 2013) (alterations added and in original) (quoting *Wright v. Craft*, 640 S.E.2d 486, 398 (S.C. Ct. App. 2006)). The arbitrator's determinations that no party interfered with Design Gaps' copyright, that the sharing of the design with Distinctive Design did not impair the drawing's marketability and that similarities in Distinctive Design's finished product

---

[8] While *Westmont* notes that this standard applies to trademark infringement claims under the Lanham Act, it goes on to provide that proving an unfair competition claim under the Lanham Act requires the same showing. 132 F.4th at 295.

derived from the nature of the space necessarily preclude Design Gaps' SCUTPA and misappropriation of trade secrets claims against Distinctive Design.[9]

Finally, Design Gaps predicated its unjust enrichment claim on Distinctive Designs' "use of designs that have directly been copied from and/or are confusingly similar to" Design Gaps' drawings. J.A. 72. As discussed above, the arbitrator directly and necessarily decided these predicate issues in Distinctive Designs' favor. Accordingly, the district court properly concluded that collateral estoppel barred Design Gaps' unjust enrichment claim against Distinctive Design.

That leaves Design Gaps' tortious interference claim against Distinctive Design. Again, this claim involved Distinctive Design's receipt and alleged use of Design Gaps' drawings in the Highsmiths' home. "An essential element to the cause of action for tortious interference with contractual relations requires the intentional procurement of the

---

[9] In any event, "the SCUTPA is not available to redress a private wrong because an unfair or deceptive act that affects only the parties to the transaction is beyond the scope of the SCUTPA." *Woodson v. DLI Props., LLC*, 753 S.E.2d 428, 435 (S.C. 2014). "Plaintiffs must allege and prove that the defendant's actions adversely affected the public interest." *Singleton v. Stokes Motors, Inc.*, 595 S.E.2d 461, 466 (S.C. 2004). "An impact on the public interest may be shown if the acts or practices have the potential for repetition." *Id.* A plaintiff may allege repetition in two ways: "(1) by showing the same kind of actions occurred in the past, thus making it likely they will continue to occur absent deterrence; or (2) by showing the company's procedures created a potential for repetition of the unfair and deceptive acts." *Id.* Here, Design Gaps alleges that Distinctive Design's conduct "is likely to have an adverse impact upon the public." J.A. 70. Design Gaps also alleges that Distinctive Design's conduct is "capable of being repeated" and is "being repeated." J.A. 70. But such conclusory allegations do not suffice under Rule 12(b)(6). Design Gaps has not plead factual allegations which demonstrate that Distinctive Design's conduct affects any party except those to this lawsuit, that Distinctive Design engaged in the same alleged misconduct in the past or that Distinctive Design's procedures have created a potential for repetition of the alleged misconduct. *See Woodson*, 753 S.E.2d at 435; *Singleton*, 595 S.E.2d at 466.

27

contract's breach." *Eldeco, Inc. v. Charleston Cnty. Sch. Dist.*, 642 S.E.2d 726, 732 (S.C. 2007). "Where there is no breach of the contract, there can be no recovery." *Id.* Here, Design Gaps alleged that interference by Distinctive Design caused Shelter and the Highsmiths to breach the Ralston Creek contracts. But the arbitrator found that Design Gaps' "repeated failure to meet the many dates promised for completion justifies the termination of the contracts." J.A. 357. In other words, Shelter and the Highsmiths did not breach the contracts because they were justified in terminating the contracts. Therefore, the arbitrator's decision precludes Design Gaps' tortious interference claim against Distinctive Design.

In sum, South Carolina res judicata principles do not require strict identity of the parties. Privity suffices, and it attaches here as between Ms. Butler and Shelter and between Ms. Highsmith individually and Ms. Highsmith in her capacity as trustee of the Highsmith Trust. For collateral estoppel purposes, the arbitrator determined the issues underlying Design Gaps' claims against Distinctive Design, and Design Gaps had a full and fair opportunity to litigate these issues in arbitration. Accordingly, we affirm the district court's orders giving preclusive effect to the arbitrator's award.

## B. Breach-of-Contract Claims Alleging Unattributed Uses of Design Gaps' Work by Shelter

We now turn to Design Gaps' contention that the district court erred in granting summary judgment to Shelter on Design Gaps' breach-of-contract claims. Remember that these claims related to Design Gaps' contention that Shelter had inappropriately used Design Gaps' work in promotional materials without attributing the work to Design Gaps.

28

The district court granted summary judgment to Shelter on two grounds. First, the district court found that the statute of limitations barred all of Design Gaps' claims, except for those concerning a joint project on Bayley Road, which occurred within the limitations period. Second, the district court found that Design Gaps had waived its right to enforce its contract as to the Bayley Road project. Before we address these grounds, we begin with a description of the parties' conduct regarding these alleged unattributed uses.

**1. Design Gaps and Shelter Communicated Extensively About Shelter's Alleged Misuse of Images of Design Gaps Cabinets in Promotional Materials**

Shelter and Design Gaps' contracts included promotional use clauses. These clauses required Shelter to attribute Design Gaps' work when showing the work in marketing materials. But Shelter displayed depictions of Design Gaps' cabinets in a number of the homes it built or renovated without attribution. Shelter also showcased Ralston Creek cabinetry on a platform called BuildZoom that helps property owners find contractors for their projects. In addition, publications such as *Charleston Home & Design*, the *Charleston Home & Design Blog*, *Charleston Style & Design* and *Architectural Digest* featured unattributed uses of Design Gaps' work on several of Shelter's projects.

Mr. Glover notified Mr. Butler about unattributed uses of Design Gaps' work in October 2016 and in March 2017. In January 2018, Ms. Glover sent Mr. Glover an email about a magazine advertisement depicting work Shelter and another cabinet supplier had performed. The feature attributed the craftmanship to the contractor.

In April 2018, Mr. Glover of Design Gaps sent Mr. Butler of Shelter a cease-and-desist letter concerning past and future unattributed uses of Design Gaps' craftsmanship.

29

The letter stated that "[f]alse and/or misleading advertising (including the omission of information) is well covered in the Federal Lanham Act as are the unjust enrichments received by the offending company." J.A. 478. Mr. Glover advised that "[i]f [the parties] are not able to come to a satisfactory agreement as to the use of our designs and work with a monetary settlement for the damages it is our intention to file for a Binding Arbitration as provided for in our contracts with Shelter, LLC." J.A. 478.[10] The record does not indicate whether Shelter responded to Mr. Glover's letter, nor does it suggest Design Gaps communicated additional promotional use concerns to Shelter.

### 2. The Statute of Limitations Bars All Design Gaps' Unattributed Use Breach-of-Contract Claims Based on Conduct Occurring Before January 2020

South Carolina law supplies a three-year statute of limitations for breach-of-contract actions. S.C. CODE ANN. § 15-3-530(1). "[E]mbedded in South Carolina's approach to the statute of limitations is a discovery rule." *Poly-Med, Inc. v. Novus Sci. Pte. Ltd.*, 878 S.E.2d 896, 900 (S.C. 2022). "Under the discovery rule, the statute of limitations begins to run from the date the injured party either knows or should know, by the exercise of reasonable diligence, that a cause of action exists for the wrongful conduct." *Epstein v. Brown*, 610 S.E.2d 816, 818 (S.C. 2005), *overruled on other grounds*, *Stokes-Craven Holding Corp. v. Robinson*, 787 S.E.2d 485 (S.C. 2016).

> The exercise of reasonable diligence means simply that an injured party must act with some promptness where the facts and circumstances of an injury would put a person of common knowledge and experience on notice that some right of his has been invaded or that some claim against another party might exist.

---

[10] The contracts mandated that the parties resolve through arbitration "[a]ll disputes arising out of or in connection with" the contracts. *See, e.g.*, J.A. 80.

*Id.* (emphasis omitted). "The date on which discovery should have been made is an objective, not subjective, question." *McAlhany v. Carter*, 781 S.E.2d 105, 110 (S.C. Ct. App. 2015) (quoting *Kreutner v. David*, 465 S.E.2d 88, 90 (S.C. 1995)).

On appeal, Design Gaps argues that it did not discover several of Shelter's violations of the promotional use clauses until after the arbitration commenced. If true, then Design Gaps discovered Shelter's breaches within the limitations period. But as already noted, what matters is not whether Design Gaps actually knew about each violation by the commencement of the limitations period but whether Design Gaps should have known about each violation before the limitations period. *Poly-Med*, 878 S.E.2d at 900. The record indicates that, at the very least, it should have known.

Design Gaps notified Shelter about alleged unattributed uses of Design Gaps' work in October 2016 and in March 2017. And in January 2018, Ms. Glover emailed Mr. Glover about a magazine advertisement featuring Shelter work with an attribution to another cabinetry supplier. Also, in April 2018, Mr. Glover sent Mr. Butler a cease-and-desist letter concerning past and future unattributed uses of Design Gaps' work. Objectively, his correspondence from Design Gaps to Shelter over the course of a year and a half regarding multiple alleged violations of the promotional use clauses put Design Gaps on notice of Shelter's alleged unattributed uses. So, we affirm the district court's grant of summary judgment to Shelter on Design Gaps' breach-of-contract claims which accrued outside of the limitations period.

### 3. Design Gaps Waived its Unattributed Use Breach-of-Contract Claims Based on the Bayley Road Project

Design Gaps also alleged that Shelter promoted images of its cabinets in a home located on Bayley Road in Charleston without attribution. Those uses occurred within the statute of limitations period. The district court, however, concluded that Design Gaps had waived its right to enforce the promotional use clause in that contract because Design Gaps had previously threatened to enforce its rights under various contracts but ultimately did not do so. "A waiver is a voluntary and intentional abandonment or relinquishment of a known right." *Janasik v. Fairway Oaks Villas Horizontal Prop. Regime*, 415 S.E.2d 384, 387 (S.C. 1992). "It may be expressed or implied by a party's conduct." *Parker v. Parker*, 443 S.E.2d 388, 391 (S.C. 1994).

"An implied waiver results from acts and conduct of the party against whom the doctrine is invoked from which an intentional relinquishment of a right is reasonably inferable." *SPUR at Williams Brice Owners Ass'n v. Lalla*, 781 S.E.2d 115, 125 (S.C. Ct. App. 2015) (quoting *Lyles v. BMI, Inc.*, 355 S.E.2d 282, 285 (S.C. Ct. App. 1987)); *see also Pitts v. N.Y. Life Ins. Co.*, 148 S.E.2d 369, 371 (S.C. 1966). "Acts inconsistent with the continued assertion of a right, such as a failure to insist upon the right, may constitute waiver." *Bonnette v. State*, 282 S.E.2d 597, 598 (S.C. 1981).

Waiver is an affirmative defense. *See Lawrimore v. Am. Health & Life Ins. Co.*, 276 S.E.2d 296, 297 (S.C. 1981). The party asserting waiver bears the burden of proof. *Frady v. Smith*, 147 S.E.2d 412, 415 (S.C. 1966), *overruled on other grounds*, *Tolemac, Inc. v. United Trading, Inc.*, 484 S.E.2d 593 (S.C. 1997). "Generally, the party claiming waiver must show that the party against whom waiver is asserted possessed, at the time, actual or

32

constructive knowledge of his rights or of all the material facts upon which they depended."
*Janasik*, 415 S.E.2d at 387–88.

Design Gaps contends that it did not take actions inconsistent with its rights. It points to three sets of communications with Shelter between October 2016 and April 2018 in which Design Gaps notified Shelter about alleged breaches. According to Design Gaps, these communications show that it wished to prevent future breaches and did not seek to relieve Shelter of its duty to comply with the promotional use clauses.

While this issue is close, we disagree. By April 2018, Design Gaps knew of some of Shelter's breaches and had constructive knowledge of others. Then, in the April 2018 letter, Mr. Glover stated that "[i]f [the parties] are not able to come to a satisfactory agreement as to the use of our designs and work with a monetary settlement for the damages," Design Gaps intended to demand arbitration. J.A. 478. Despite its knowledge, Design Gaps did not demand arbitration. Instead, it continued to do business with Shelter, did not raise additional concerns with Shelter and waited over four years to file suit. In fact, even though the Highsmiths and Shelter initiated arbitration proceedings against Design Gaps on the Ralston Creek project, Design Gaps did not allege any unattributable use violations during those proceedings, including any related to that job.

In considering the record, it is important to remember that our inquiry here is objective—whether it was reasonable to infer that Design Gaps had relinquished its rights, not whether it subjectively intended to. Under that standard, Design Gaps' actions demonstrate, as a matter of law, that it is reasonably inferable that Design Gaps waived its

33

claims for breaches of the Bayley Road contract. Thus, the district court properly granted summary judgment on the Bayley Road claims.

### C. Laches Bars Design Gaps' Lanham Act Unattributed Use Claims

Finally, Design Gaps argues the district court erred in concluding that laches barred its claims under § 43(a) of the Lanham Act against Shelter stemming from Shelter's uses of Design Gaps' work in promotional materials without attribution.[11] Before explaining why the district court did not err in applying laches, we briefly outline Design Gaps' causes of action.

The Lanham Act primarily addresses trademark protection. But § 43(a) of the Lanham Act also creates causes of action such as false association and false advertising. *Belmora LLC v. Bayer Consumer Care AG*, 987 F.3d 284, 292 (4th Cir. 2021).

> The typical § 43(a) Lanham Act claim is brought by a plaintiff who is in competition with the defendant, and charges the defendant with using a mark—a brand name, a word, "a slogan, a symbol, a combination of words and symbols, an ornamental feature, a distinctive shape, or something else intended to remind the consumer of the brand"—so similar to that of the plaintiff's that the public may be confused as to the source of the good or service.

---

[11] We ordinarily review "the district court's application of the equitable doctrine of laches for abuse of discretion." *Ray Commc'ns, Inc. v. Clear Channel Commc'ns, Inc.*, 673 F.3d 294, 299 (4th Cir. 2012). A district court abuses its discretion when applying erroneous legal principles or making clearly erroneous factual findings. *Id.* But when reviewing "a laches determination made on summary judgment," we apply a two-part standard. *Id.* We "review the sufficiency of the evidence in support of or in opposition to summary judgment de novo, but we review the district court's application of laches elements to the undisputed material facts for abuse of discretion." *Id.* Put differently, if the district court applies the law correctly and does not view disputed facts against the non-movant, then we review the district court's application of laches for an abuse of discretion. *Id.*

*Advanced Res. Int'l, Inc. v. Tri-Star Petroleum Co.*, 4 F.3d 327, 334 (4th Cir. 1993) (quoting *Balu Plumbing, Inc. v. S.O.S. Fix-It, Inc.*, 781 F.2d 604, 609 (7th Cir. 1986)).

Here, Design Gaps has alleged three types of § 43(a) claims against Shelter—false advertising, false designation of origin and unfair competition. On the merits, analyzing these related but distinct claims would take some work. *See PBM Prods., LLC v. Mead Johnson & Co.*, 639 F.3d 111, 120 (4th Cir. 2011) (stating elements of false advertising claim); *Lamparello v. Falwell*, 420 F.3d 309, 313 (4th Cir. 2005) (stating elements of false designation of origin claim); *Westmont*, 132 F.4th at 295 (stating elements of unfair competition claim). But for the purposes of our analysis, we can assume without deciding that the defendants violated the Lanham Act. That's because the laches inquiry does not require us to decide the merits of Design Gaps' claims.

Instead, "laches generally applies to preclude relief for a plaintiff who has unreasonably 'slept' on his rights." *PBM Prods.*, 639 F.3d at 121. It "is 'an equitable defense' that 'is distinct from the statute of limitations.'" *Belmora*, 987 F.3d at 294 (quoting *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 835 (9th Cir. 2002)). "Because the Lanham Act does not include a limitations period for § 43(a) claims" and "§ 43(a) is [a] federal law for which a state statute of limitations would be an unsatisfactory vehicle for enforcement," defendants may assert a laches defense to § 43(a) claims in situations where a statute of limitations defense might otherwise apply. *Id.* at 289, 293. Still, "the statute of limitations from the most analogous state law will continue to play an important role in [a] laches analysis" because "[l]aches is presumed to bar § 43(a) claims filed outside the analogous limitations period." *Id.* at 294.

35

"But 'whether a Lanham Act claim has been brought within the analogous state statute of limitations is not the sole indicator of whether laches may be applied in a particular case.'" *Id.* at 295 (quoting *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 822 (7th Cir. 1999)). When the laches presumption applies, courts consider three "factors to determine if [a plaintiff] can overcome the presumption: (1) whether [the plaintiff] knew of [the defendant]'s adverse use of the [plaintiff's] mark, (2) whether [the plaintiff]'s delay in challenging that use 'was inexcusable or unreasonable,' and (3) whether [the defendant] 'has been unduly prejudiced' by [the plaintiff]'s delay." *Id.* (quoting *Ray Commc'ns, Inc. v. Clear Channel Commc'ns, Inc.*, 673 F.3d 294, 300 (4th Cir. 2012)). "[T]he greater the delay, the less [] prejudice required to show laches, and vice versa." *White v. Daniel*, 909 F.2d 99, 102 (4th Cir. 1990).

Design Gaps does not dispute Shelter's contention that South Carolina's three-year statutes of limitations for fraud and unfair trade practices supply the analogous limitations period. *See* S.C. CODE ANN. §§ 15-3-530(7), 39-5-150. So, because Design Gaps filed its lawsuit on January 13, 2023, any alleged Lanham Act violations occurring before January 2020 fall outside of the limitations period. As before, undoubtedly, some of Shelter's violations occurred outside of the limitations period.

To overcome the presumption, Design Gaps makes three arguments. First, it argues that it did not have sufficient information concerning Shelter's violations until arbitration commenced. Shelter responds that Design Gaps realized Shelter's violations by April 2018 at the latest. We agree with Shelter. Mr. Glover's April 2018 cease-and-desist letter, which concerned Shelter's unattributed uses of Design Gaps' work, stated that "[f]alse and/or

36

misleading advertising (including the omission of information) is well covered in the Federal Lanham Act as are the unjust enrichments received by the offending company." J.A. 478. This letter indicates that Design Gaps had considered the applicability of the Lanham Act to Shelter's unattributed use.

Undeterred, Design Gaps argues that it did not have information to prove each element of its Lanham Act claims when sending the letter. Design Gaps relies on *What-A-Burger of Va., Inc. v. Whataburger, Inc. of Corpus Christi*, 357 F.3d 441 (4th Cir. 2004). In *Whataburger*, we concluded that "[t]he owner's mere knowledge that he might have an infringement claim at some future date is not sufficient to trigger the period of unreasonable delay required for estoppel by laches." 357 F.3d at 450. But as Shelter contends, the inquiry is objective—"[t]he question whether a trademark owner knew or should have known that it had a viable claim for infringement is determined by an objective standard." *Ray*, 673 F.3d at 300–01 (citing *Whataburger*, 357 F.3d at 449).[12]

By April 2018, the record is undisputed that Design Gaps knew Shelter was using Design Gaps' cabinet work in its promotional materials and that Shelter was not attributing that work to Design Gaps. Design Gaps had also stated in writing that it believed such conduct was false and misleading as to the origin of the cabinet work and that Design Gaps was being harmed. These facts are virtually identical to those alleged to support Design Gaps' Lanham Act claims in this lawsuit. Therefore, the presumption of laches applies.

---

[12] Though both *Whataburger* and *Ray* speak in terms of trademark infringement claims under the Lanham Act, 15 U.S.C. § 1114(1), we see no reason that these principles should not apply with equal force to § 43(a) claims.

37

The parties dispute whether Shelter's unattributed uses of Design Gaps' work—if Lanham Act violations—would constitute a continuing violation such that the presumption of laches applies to all of Design Gaps' Lanham Act claims. Design Gaps contends that such a finding would be inconsistent with our admonition that Lanham Act plaintiffs may not mix and match statements to make out a violation, citing *Verisign, Inc. v. XYZ.COM LLC*, 848 F.3d 292 (4th Cir. 2017). But *Verisign* applies this principle in the context of a plaintiff's burden of proof concerning their Lanham Act claims, not in determining whether the presumption of laches applies to a plaintiff's claims. *Id.* at 299.

Shelter relies on the Ninth Circuit's *Jarrow* decision that held "that the presumption of laches is triggered if any part of the claimed wrongful conduct occurred beyond the limitations period." 304 F.3d at 837. "To hold otherwise," the Ninth Circuit reasoned, "would 'effectively swallow the rule of laches, and render it a spineless defense.'" *Id.* (quoting *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 953 (9th Cir. 2001)). In *PBM Products*, we cited *Jarrow* when concluding that a party had unreasonably delayed in bringing its Lanham Act claims. *PBM Prods.*, 639 F.3d at 122 (citing *Jarrow*, 304 F.3d at 837). We concluded the presumption applied to timely Lanham Act claims because alleged misconduct also had taken place outside of the limitations period. *See id.* at 121–22. The analysis in *PBM Products* derived from the nature of the promotional materials at issue. We noted that the defending party had used the same type of false claim in advertisements before and after the date the limitations period commenced, and the Lanham Act claimant knew of this use. *See id.* Here, like in *PBM Products*, though the medium of the promotional materials used by Shelter varied, the core "claim" remained the same—Shelter

38

did not attribute cabinetry work to Design Gaps. Therefore, Shelter's unattributed uses of Design Gaps' work constitute a continuing violation for the purposes of laches.

Second, Design Gaps argues that we should excuse its delay for two reasons. Initially, Design Gaps points to an Eleventh Circuit decision, *Citibank, N.A. v. Citibanc Group, Inc.*, 724 F.2d 1540 (11th Cir. 1984). There, the defendants argued that laches barred Citibank's claims because Citibank should have known of the defendants' use of its name "prior to 1960, but did not file suit until 1979." *Id.* at 1546. "When [Citibank] first learned of defendants' adoption of Citibanc as the name of its holding company in 1972, [Citibank] wrote letters warning that it regarded the use of" the name "as an infringement of [Citibank]'s rights." *Id.* So far, these facts track with Mr. Glover's notifications to Shelter, including the cease-and-desist letter.

But unlike in *Citibank*, after sending the cease-and-desist letter, Design Gaps did not "sen[d] several other letters over the next few years" before bringing suit. *Id.* Moreover, in *Citibank*, the defendants did "not rel[y] on the delay of plaintiffs in expanding their use of the mark; indeed, they [] expanded their use while asserting their right to do so, in the face of plaintiff's constant complaints." *Id.* at 1547. Here, the record does not indicate that Shelter asserted its belief that it had the right to promote its work in the way it did to Design Gaps. Nor does the record show that Design Gaps complained "constant[ly]" about continued unattributed uses after April 2018. *See id.* at 1547. Thus, we find *Citibank* distinguishable. *Cf. Jarrow*, 304 F.3d at 832, 838–89 (concluding plaintiff unreasonably delayed in asserting claims when threatening litigation in 1993 but waiting approximately seven years to file suit).

39

Relatedly, Design Gaps argues that we should excuse its delay because the parties engaged in settlement discussions. Even assuming settlement negotiations could justify a delay in bringing a lawsuit, the record does not support Design Gaps' argument. True, Mr. Glover's cease-and-desist letter expressed an interest in "com[ing] to a satisfactory agreement as to the use of [Design Gaps] designs and work with a monetary settlement for the damages." J.A. 478. However, the record does not indicate that the parties engaged in settlement talks following Mr. Butler's receipt of the letter. Design Gaps points out correctly that Shelter did not respond to the letter, but this fact does not establish the presence of settlement discussions on which Design Gaps may base excusable delay. Therefore, Design Gaps has not demonstrated the reasonableness of its nearly four-year delay in bringing suit.

Third, Design Gaps contends Shelter was not prejudiced by its delay in asserting its Lanham Act claims. We recognize both economic and evidentiary prejudice. *Ray*, 673 F.3d at 305–07. "A defendant suffers economic prejudice when it relies on the [plaintiff]'s inaction by developing a valuable business around the" plaintiff's mark. *Id.* at 305. Still, a defendant's "assertion that it would suffer economic injury if enjoined from using" a plaintiff's mark, "without reference to any evidence beyond the length of time it has used the mark, is simply insufficient to establish economic prejudice." *Id.* at 306. By way of example, in *PBM Products*, we found "unreasonable delay prejudiced" the defendant "because of [the defendant]'s continued use of the advertisement on all of its [products] in over a dozen retail stores for years," to the point that the plaintiff alleged that the defendant

40

"ha[d] been unjustly enriched by over $27 million." 639 F.3d at 122 (internal quotation marks and quotation omitted).

While the record does not suggest that Shelter obtained $27 million in economic benefit like the defendant in *PBM Products*, Shelter has demonstrated its continued economic investment in promotional materials between 2015 and 2022. Design Gaps has not rebutted this specific showing; indeed, its briefing on this point is conclusory.

"Evidentiary prejudice encompasses such things as lost, stale or degraded evidence or witnesses whose memories have faded or who have died." *Ray*, 673 F.3d at 305 (4th Cir. 2012). A defendant must "articulate how" these occurrences "would prejudice [its] defense specifically." *Id.* at 306–07. Indeed, a defendant "ha[s] an obligation to adduce specific evidence of prejudice in order to thwart" a plaintiff's claim based on laches. *Id.* at 307 (quoting *Vineberg v. Bissonnette*, 548 F.3d 50, 58 (1st Cir. 2008)).

On this point, Shelter primarily relies on the fact that Mr. Butler has passed away. According to Shelter, Mr. Butler communicated with Mr. Glover about Shelter's alleged conduct. Because Mr. Butler would have provided key testimony concerning Design Gaps' Lanham Act claims, but cannot now do so, Shelter has demonstrated specifically how his death has prejudiced it.

Design Gaps does not really dispute Mr. Butler's relevance to this claim. But it contends that it served interrogatories and requests for production on Mr. Butler ten weeks before his unexpected death and that Shelter's refusal to answer discovery and deficient responses created the prejudice Shelter claims to have suffered. Design Gaps has not supported this argument with citation to the record. Besides, written discovery responses

41

are no substitute for live testimony. Any responsibility for discovery issues does not change the fact that Shelter has demonstrated some evidentiary prejudice. When considered in the context of over four years of unreasonable delay, we conclude that Shelter has carried its burden.

## IV. CONCLUSION

Design Gaps has fought tooth and nail to hold the defendants liable for their alleged wrongful conduct. First came the arbitration. Then came a federal court lawsuit over the result of that arbitration. When both of those failed, Design Gaps filed the lawsuit which is now before us on appeal. But res judicata and collateral estoppel prevent successive litigation concerning claims and issues already decided in prior proceedings. And statutes of limitations, laches and waiver, in this context, stop a party from waiting too long after learning of alleged misconduct to file a lawsuit. For the reasons stated in this opinion, we reject Design Gaps' attempt to get around these longstanding features of our law. The third time is not the charm. The district court's orders are, therefore,

*AFFIRMED.*